**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3693-23

MARTHA MIQUEO,

     Plaintiff-Respondent,

v.

300 SYLVAN AVE ASSOCIATES,
LLC, PERSISTENCE AND
SUCCESS, LLC, and CARMEN
GOENAGA,

     Defendants-Appellants.

_____

> Argued May 21, 2025 – Decided August 4, 2025
>
> Before Judges Paganelli and Torregrossa-O'Connor.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000165-23.
>
> Kory Ann Ferro argued the cause for appellants (Greenspoon Marder LLP, attorneys; Kory Ann Ferro and Kelly M. Purcaro, of counsel and on the briefs).
>
> Anthony S. Bocchi argued the cause for respondent (Bocchi Law LLC, attorneys; Anthony S. Bocchi and Jennifer L. Bocchi, of counsel and on the brief).

PER CURIAM

Defendants, 300 Sylvan Ave Associates, LLC (300 Sylvan), Persistence and Success, LLC, (P&S), and Carmen Goenaga (Carmen),[1] appeal from the Chancery Division's order of July 16, 2024, referring this matter to arbitration. While we are convinced the parties' arbitration clause covered the claims asserted in plaintiff's, Martha Miqueo's (Martha),[2] verified complaint, we are also clearly convinced she waived her rights to arbitration through the course of this litigation. Therefore, we reverse the court's order, and remand the matter for trial.

We glean the factual allegations and procedural history from the record. On August 22, 2023, Martha filed a verified complaint against defendants.[3] She sought "a judgment directing the specific performance of a written agreement to transfer title to the building and property located at 300 Sylvan Avenue,

---

[1] Carmen Goenaga and Bernardo Goenaga, also involved in this matter, share the same surname. Therefore, we refer to them by their first names to avoid confusion. No disrespect is intended.

[2] Martha Miqueo is also referenced in the record as Martha Miqueo-Elian. Further, because her husband, Nicholas Elian, is also involved, we use their first names to avoid confusion. No disrespect is intended.

[3] Also, on August 22, 2023, the defendants and Bernardo's estate filed a complaint in the Law Division against Martha and her entities.

Englewood Cliffs, New Jersey (the 'Property')." "[C]onsistent with [Martha]'s understanding and course of conduct since 2012 with her uncle, Bernardo . . . [she sought] a judgment declaring that she is the equitable owner of the Property." Martha asserted she had "the right to have legal title transferred to her upon repaying [d]efendants the agreed upon amount needed to repay [Bernardo]."

Martha claimed she and Nicholas, through their entities Vizstara, LLC and Vizstara Professional LLC, "conducted their dental practice from the Property since 2008 and, together with another husband/wife dental team, owned the entity which owned the Property until 2012." Martha asserted that she "and her husband invested . . . million[s] into the Property." However, they "faced substantial financial difficulties[,] . . . could not make mortgage . . . payments and, ultimately the entity . . . filed [for] bankruptcy . . . and the Property was sold to an unrelated entity."

According to Martha, Bernardo "agreed to advance [her] money to deal with her financial issues." Bernardo "provided funding to purchase the Property and agreed to hold title thereto with the understanding that, upon payment of the amounts advanced [by him] . . ., legal title to the Property would be conveyed to" Martha.

A-3693-23

On May 14, 2012, Martha and Bernardo executed a Memorandum of Understanding (MOU). The MOU stated there was a prior loan agreement between the two, and the parties "wish to agree upon an additional loan" and to "execute a second mortgage on the [P]roperty." The expressed intent of the MOU was to allow Martha to "secure bank financing for the acquisition of the current mortgage on the Property or the Property." The MOU contains an arbitration provision.

In July 2012, Bernardo prepared an operating agreement for P&S. Bernardo was the only member and Martha was the manager. In August 2012, P&S adopted an amended and restated operating agreement for 300 Sylvan. Martha was named the manager of 300 Sylvan. The operating agreements contain arbitration provisions. In her complaint, Martha described 300 Sylvan as the property owner and P&S as the sole member of 300 Sylvan.

In 2017, Martha, Bernardo and Carmen had a "Limited Liability Company Interest Purchase Agreement" (2017 Agreement) prepared. The agreement purported to provide for Martha to acquire P&S and 300 Sylvan from Bernardo and Carmen. The agreement does not contain an arbitration provision. The agreement was never executed.

In May 2022, Martha and Bernardo executed an "Addendum to Promissory Note Agreement (Addendum)." The Addendum referenced the unexecuted 2017 Agreement. The Addendum stated Bernardo "agrees to sell/transfer ownership of [the Property] . . . to Martha . . . and 300 Sylvan." The Addendum did not mention arbitration.

In June 2022, Bernardo passed away and Carmen, Bernardo's daughter, succeeded him as the sole member of P&S. Martha alleged she "tried to engage . . . Carmen, regarding the transfer of title to the Property and have her move forward with same," however, Carmen "ha[d] not made any attempt or effort to proceed with the agreed upon transfer of the Property" and "has ignored the . . . [a]greement and" had not responded.

Martha requested the court find defendants in breach of contract and order specific performance and sought a declaration of her rights concerning the Property.

According to the Rule 4:5-1 certification attached to Martha's complaint, "the matter in controversy herein is not the subject of any other court proceeding or arbitration. No other action or arbitration proceeding is presently contemplated."

A-3693-23

On August 28, 2023, the Chancery judge granted Martha's order to show cause (OTSC) with restraints. Pending the return date on the OTSC,

> [d]efendants, their agents, members, managers, employees, representatives, servants and independent contractors, are temporarily enjoined and restrained from engaging in any acts outside of the ordinary course of operation and business which could affect the ownership or value of the Property, including, but not limited to, (i) selling, transferring, disposing or otherwise alienating the Property or any ownership interests in the title holder of the Property; (ii) mortgaging, encumbering or permitting liens to be placed upon the Property or any ownership interest in the title holder of the Property; (iii) entering into any lease transaction with regard to the Property, (iv) evicting tenants, and/or (v) undertaking or contracting to perform any capital improvements to the Property; . . . outside of the ordinary course of business and shall maintain the status quo.

Defendants moved to "dissolve or. . . modify the temporary restraints." Defendants also filed an OTSC seeking to disqualify Martha's counsel. During the hearing on the return of the OTSC, the judge stated Martha could not sustain her burden under Crowe,[4] but he nevertheless continued the restraints invoking

---

[4] Crowe v. De Gioia, 90 N.J. 126 (1982).

6

the court's "equitable powers" to maintain the status quo, citing <u>Waste Management</u>.[5]

Martha's counsel filed a substitution of attorney, thereby resolving defendants' motion for disqualification. Defendants filed a verified answer with affirmative defenses and counterclaims. On November 15, 2023, the judge executed the parties' consent order for mediation. Also, the judge executed an order that, in part provided:

> [U]ntil the entry of a final judgment, written agreement of the [p]arties, or further [o]rder of this [c]ourt, [d]efendants, their agents, members, managers, employees, representatives and independent contractors, . . . are preliminary enjoined and restrained from (i) selling, transferring, disposing or otherwise alienating the Property or any ownership interests in the title holder of the Property, and (ii) evicting Vizstara, LLC or Vizstara Professional, LLC from the Property;
> . . . .
>
> . . . Defendants may not mortgage or encumber the Property, except upon written notice to [Martha], whose consent is not to be unreasonably withheld. . . .
>
> . . . Defendants, their agents, members, managers, employees, representatives and independent contractors, . . . shall not undertake or contract to perform extraordinary improvements to the Property,

---

[5]  <u>Waste Mgmt. of N.J., Inc. v. Morris Cnty. Utils. Auth.</u>, 433 N.J. Super. 445 (App. Div. 2013).

> except upon written notice to [Martha], whose consent
> is not to be unreasonably withheld. . . .

Martha filed an answer to defendants' counterclaim. She did not assert that the court lacked jurisdiction or that the parties' claims were subject to an arbitration agreement.

On January 19, 2024, Martha filed a motion to consolidate the Chancery Division matter with the Law Division matter. On March 8, 2024, the Chancery judge denied the motion to consolidate.

In April 2024, Martha filed a motion to compel arbitration in the Law Division matter. The motion was withdrawn to allow the parties to mediate. After Martha filed a motion to compel arbitration of her Chancery matter, the parties in the Law Division matter entered into a consent order transferring the matter to arbitration. On June 20, 2024, after hearing the parties' arguments, the Chancery judge issued an oral opinion and granted the motion. The judge explained his analysis was fact specific and required the application of common sense. The judge determined Atalese v. U.S. Legal Services Group, L.P., 219 N.J. 430 (2014), was not applicable because these were "commercial parties."

The judge found there was "some paper discovery, perhaps not all of it," but noted "[t]here ha[d] been no depositions taken." Further, there were no "dispositive-type motions," although there were motions for disqualification and

consolidation. The judge noted a trial date was scheduled. The judge found the motion for arbitration was not made as a "litigation strategy." The judge determined Martha did not waive her right to arbitration under Cole v. Jersey City Medical Center, 215 N.J. 265 (2013).

The judge stated the Law Division and Chancery matters "all [concern] the same people" and Martha "is trying to buy the [P]roperty" and "[t]hey were trying to save the [P]roperty." Thus, to the judge, "they have a lot to do with each other." The judge noted the parties "entered into agreements. . . . There was an MOU, there are operating agreements" and "[t]hey did put arbitration clauses in some of these agreements. Then there w[ere] subsequent agreements." The judge acknowledged Martha's argument that "they all emanate out of the same set[] of transactions."

Further, the judge found it problematic that the parties "are going to . . . start doing discovery on the whole management issue and what she did or did[ no]t do." In addition, the judge stated he "just d[id no]t see how it [wa]s going to suit anybody to handle this piecemeal." The judge "just th[ought] it should be handled together." Indeed, once the parties got to an arbitrator, and "th[e arbitrator] g[o]t all of this and they decide all of this and then it is done." The judge determined "everything stems out of th[e] MOU" that was not

9

"terminated." The judge entered the June 25, 2024 order compelling the Chancery matter be arbitrated with the Law Division matter.

On appeal, defendants contend the judge erred because: (1) the contract upon which Martha claims the right to arbitration does not contain an arbitration provision and the contracts the judge relied upon "were supplanted, invalid and otherwise inapplicable to the dispute at issue"; and (2) Martha waived her right to compel arbitration.

We begin our review by recognizing "the affirmative policy of this State, both legislative and judicial, favors arbitration as a mechanism of resolving disputes." Martindale v. Sandvik, Inc., 173 N.J. 76, 92 (2002). Generally, arbitration agreements "should . . . be read liberally to find arbitrability if reasonably possible." Jansen v. Salomon Smith Barney, Inc., 342 N.J. Super. 254, 257 (App. Div. 2001). A court must resolve all doubts related to the scope of an agreement "in favor of arbitration." Id. at 258.

Nevertheless, "[t]hat favored status . . . is not without limits." Gayles v. Sky Zone Trampoline Park, 468 N.J. Super. 17, 23 (App. Div. 2021) (alteration in the original) (quoting Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 131-32 (2001)).

Therefore, "[a] court must first apply 'state contract-law principles . . . [to determine] whether a valid agreement to arbitrate exists.'" Ibid. (second alteration in original) (quoting Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 186 (2013)). "This preliminary question, commonly referred to as arbitrability, underscores the fundamental principle that a party must agree to submit to arbitration." Ibid. (quoting Hirsch, 215 N.J. at 187). Thus, "[a] court's initial inquiry must be—just as it is for any other contract—whether the agreement to arbitrate . . . is 'the product of mutual assent, as determined under customary principles of contract law.'" Ibid. (quoting Atalese, 219 N.J. at 442). "A legally enforceable agreement requires 'a meeting of the minds.'" Atalese, 219 N.J. at 442 (quoting Morton v. 4 Orchard Land Tr., 180 N.J. 118, 120 (2004)).

Certainly, "[p]arties are not required 'to arbitrate when they have not agreed to do so.'" Atalese, 219 N.J. at 442 (quoting Volt Info. Scis. v. Bd. of Trs. of Leland Stanford Jr. Univ., 489 U.S. 468, 478 (1989)). Furthermore, "only those issues may be arbitrated which the parties have agreed shall be." Garfinkel, 168 N.J. at 132 (quoting In re Arb. Between Grover & Universal Underwriters Ins. Co., 80 N.J. 221, 228 (1979)).

"De novo review applies when appellate courts review determinations about the enforceability of contracts, including arbitration agreements."

11                                                                          A-3693-23

<u>Kernahan v. Home Warranty Adm'r of Fla., Inc.</u>, 236 N.J. 301, 316 (2019). "Whether a contractual arbitration provision is enforceable is a question of law, and we need not defer to the interpretative analysis of the trial . . . court[] unless we find it persuasive." <u>Ibid</u>.

"A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." <u>Hardy ex rel. Dowdell v. Abdul-Matin</u>, 198 N.J. 95, 103 (2009). "[T]he terms of the contract must be given their 'plain and ordinary meaning.'" <u>Schor v. FMS Fin. Corp.</u>, 357 N.J. Super. 185, 191 (App. Div. 2002) (quoting <u>Nester v. O'Donnell</u>, 301 N.J. Super. 198, 201 (App. Div. 1997)). "Where the terms of an agreement are clear, we ordinarily will not make a better contract for parties than they have voluntarily made for themselves, nor alter their contract for the benefit or detriment of either . . . ." <u>Carroll v. United Airlines, Inc.</u>, 325 N.J. Super. 353, 358 (App. Div. 1999). In other words, "[i]f the contract into which the parties have entered is clear, then it must be enforced as written." <u>Serico v. Rothberg</u>, 234 N.J. 168, 178 (2018) (quoting <u>In re Cnty. of Atl.</u>, 230 N.J. 237, 254-55 (2017)).

The New Jersey Supreme Court "has recognized that parties may waive their right to arbitrate in certain circumstances." <u>Cole</u>, 215 N.J. at 276. "The

issue of whether a party waived its arbitration right is a legal determination subject to de novo review." Id. at 275.

"Waiver is the voluntary and intentional relinquishment of a known right." Knorr v. Smeal, 178 N.J. 169, 177 (2003). "Waiver is never presumed." Cole, 215 N.J. at 276. An agreement to arbitrate a dispute "can only be overcome by clear and convincing evidence that the party asserting it chose to seek relief in a different forum." Spaeth v. Srinivasan, 403 N.J. Super. 508, 514 (App. Div. 2008). The Court has "determined that a party need not expressly state its intent to waive a right; instead, waiver can occur implicitly if 'the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference.'" Cole, 215 N.J. at 277 (quoting Knorr, 178 N.J. at 177). Nonetheless, "a waiver must be done 'clearly, unequivocally, and decisively.'" Ibid. (quoting Knorr, 178 N.J. at 177).

"Determining whether a party waived a right is a fact-sensitive analysis." Ibid. "[T]he mere institution of legal proceedings or the assertion of an affirmative defense by way of an answer . . . do not . . . constitute a waiver of a right to proceed with arbitration in accordance with the terms of an arbitration agreement." Hudik-Ross, Inc. v. 1530 Palisade Ave. Corp., 131 N.J. Super. 159, 167 (App. Div. 1974); see also Spaeth, 403 N.J. Super. at 514. Our statement

13

in <u>Lucier v. Williams</u>, that "[p]arties waive the right to arbitration where they commence litigation," 366 N.J. Super. 485, 500 (App. Div. 2004), should not be construed to draw a bright line foreclosing arbitration. Instead, we must engage in the detailed analysis required in <u>Cole</u>. Therefore,

> [i]n deciding whether a party to an arbitration agreement waived its right to arbitrate, we concentrate on the party's litigation conduct to determine if it is consistent with its reserved right to arbitrate the dispute. Among other factors, courts should evaluate: (1) the delay in making the arbitration request; (2) the filing of any motions, particularly dispositive motions, and their outcomes; (3) whether the delay in seeking arbitration was part of the party's litigation strategy; (4) the extent of discovery conducted; (5) whether the party raised the arbitration issue in its pleadings, particularly as an affirmative defense, or provided other notification of its intent to seek arbitration; (6) the proximity of the date on which the party sought arbitration to the date of trial; and (7) the resulting prejudice suffered by the other party, if any. No one factor is dispositive.
>
> [<u>Id.</u> at 280-81.]

I.

Defendants contend the trial court erred in transferring the matter to arbitration because "the 2022 Addendum upon which [Martha] bases her case, and for which she seeks specific performance, does not have an arbitration agreement thereby precluding the Chancery [c]ourt from compelling arbitration of this case."

14

Moreover, defendants assert "the 2022 Addendum does not incorporate a prior arbitration provision or reference arbitration in any way." Further, defendants note "the only other agreement referenced in the 2022 Addendum is 'an agreement entered into [o]n January 1, 2017[,] relating to the sale and purchase of' the Property, which is the 2017 Unexecuted Agreement and is similarly devoid of any arbitration provision."

Defendants also note the parties are not the same, stating Martha "seeks to compel the purchase [of] the Property . . . from the sole current owner of P&S, Carmen." However, "the [o]perating [a]greements and related mismanagement claims under which the Law Division [c]ase [wa]s proceeding [wa]s brought by . . . Bernardo and the [c]ompanies against [Martha], [Nicholas], and [Martha]'s companies."

Defendants argue the trial "court improperly relied on arbitration provisions in the long since abandoned 2012 MOU and the unrelated [o]perating [a]greements which govern management of the Property—not the proposed sale of same."

Defendants note "[i]n direct contravention of the . . . [c]ourt's prior refusal to consolidate this case and the Law Division [c]ase, the . . . [c]ourt inexplicably

15

decided it 'think[s] it should be handled together' to avoid 'duplicating discovery' and so there could be a 'story told and a decision made.'"

Martha argues the court "correctly found that the parties should be compelled to arbitrate pursuant to the enforceable arbitration agreement within the MOU."  She contends defendants' position is misguided because it focuses on "the 2022 Addendum, which, admittedly, does not have any arbitration terms" and ignores the "transactional history."  Martha asserts "[t]he record supports a finding that the 2022 Addendum was unquestionably a continuation of the MOU's rescue plan and the [o]perating [a]greements' structure."

In addition, Martha argues "the 2022 Addendum is rooted in the 2012 MOU and the subsequent [o]perating [a]greements of P&S and 300 Sylvan."  Therefore, Martha asserts "[t]he . . . court correctly concluded that the parties intended for the [2012 MOU] arbitration provision to be included in the 2022 Addendum."

We start with the language of the 2012 MOU.  As relevant here, the 2012 MOU provides:

> 1.  <u>Expression of Intent.</u>  This Memorandum is an expression of the interest and intent of the Parties which will <u>form the basis of one or more formal agreements between the Parties</u> which may be necessary, proper or advisable until . . . [Martha] secure[s] bank financing for the acquisition of the current mortgage on the

A-3693-23

Property or the Property and . . . [Martha] and [Bernardo] are fully able to execute and deliver a second mortgage agreement between the Parties relating to such Property.

. . . .

4. <u>Governing Law.</u> This Memorandum shall be construed and governed in accordance with the laws of the State of New Jersey. <u>Any dispute arising out of or relating to this Memorandum shall be resolved by an arbitrator appointed according to the arbitration rules of the American Arbitration Association.</u>

[(Emphasis added).]

The clear terms of the 2012 MOU pertain to Martha's acquisition of the property from Bernardo; envision that additional agreements may be necessary to effectuate the acquisition; and provide "[a]ny dispute arising out of or relating to the" MOU shall be resolved in arbitration. Martha contends the May 2022 Addendum and the P&S and 300 Sylvan operating agreements are the additional agreements anticipated in the 2012 MOU.

Defendants make misplaced assertions that there is no enforceable arbitration agreement as the: (1) 2012 MOU was abandoned; (2) 2022 Addendum is silent as to arbitration; (3) 2022 Addendum "does not incorporate a prior arbitration provision or reference arbitration in any way"; and (4) operating agreements are unrelated to the 2012 MOU.

17

Instead, defendants' assertions are in fact "disputes arising out of or relating to" the 2012 MOU. In other words, the parties chose arbitration as their forum to resolve whether the 2012 MOU was abandoned and whether the subsequent addendum and operating agreements were part of the "one or more formal agreements" contemplated by the parties in the 2012 MOU. To the extent the Chancery judge determined the 2012 MOU was not "terminated," we conclude he overstepped because the parties agreed the arbitrator would resolve that dispute as well.

Therefore, Martha's asserted claims in the Chancery Division—regarding her rights concerning the acquisition of and equitable title to the Property—were claims subject to the parties' 2012 MOU arbitration clause.

## II.

We next consider defendants' argument that even assuming this matter could be compelled to arbitration, Martha "waived her[] right to arbitration through her extensive litigation conduct in, and the self-election of, the Chancery Division."

Defendants argue Martha waived her right to arbitration when she

> (1) selected the Chancery Division to file her claim
> . . .; (2) affirmatively certified pursuant to Rule 4:5-1
> that "no other action or arbitration proceeding is
> contemplated," . . .; [and] (3) sought and obtained

18

temporary restraints against [defendant]s . . .; (4) engaged in mediation ordered by the Chancery Court . . .; (5) filed and lost a motion to consolidate . . .; (6) failed to assert arbitration as an affirmative defense to [defendant]s' counterclaims . . .; (7) engaged in substantive discovery . . .; and (8) delayed about nine months in making an arbitration request – at which time trial was scheduled to proceed in about two months.

In applying the Cole factors, defendants assert:

First, there was a delay of approximately nine months, during which the [p]arties engaged in six [c]ourt appearances (three motion hearings and three status conferences), [thirty-six] filings on the docket, discovery exchange, and had a trial date approaching two months from the return date of [Martha]'s [m]otion to [c]ompel [a]rbitration – which is substantial and weighs in favor of waiver. . . .

Second, [Martha] instituted this action with an [OTSC] under which she received temporary restraints against [defendants]. These restraints have been in place and enjoining [defendants] actions since August 28, 2023[,] and remain in place to date. Such restraints would not have been available to [Martha] in arbitration. As such, [Martha] sought the benefit of [c]ourt intervention and, after she received the benefit of same for nine months (and, indeed, continues to receive same), she sought to compel this matter to arbitration. [Martha]'s use and manipulation of the [c]ourt to obtain restraints weighs heavily in favor of waiver. . . .

Third, the delay in seeking arbitration was part of [Martha]'s litigation strategy tactics. [Martha] used the Chancery [c]ourt's equitable powers to obtain significant and extraordinary, immediate restraints

19

against [defendant]s. She availed herself to the Chancery [c]ourt's authority for a mediation referral. [Martha] used the Chancery [c]ourt to obtain copious discovery from [defendant]s. Once [Martha]'s deposition date was quickly approaching and trial about two months away, [she] ceased responding to discovery and filed her [m]otion to [c]ompel [a]rbitration. [Martha]'s delay tactics, including over nine months of availing herself to the benefits of the Chancery [c]ourt only to hit pause on essentially the eve of trial, weigh in favor of waiver. . . .

Fourth, discovery was ongoing and extensive. Both [p]arties served substantial paper discovery (two sets of document demands and four sets of interrogatories) and produced a combined over 4,400 pages of documents. After which [Martha] ceased cooperating with discovery, electing instead to self-impose a stay of discovery, refusing to cure deficiencies, respond to interrogatories, or produce [herself] for her noticed deposition. This amount of discovery certainly exhibits [Martha]'s waiver of arbitration. . . . Months after filing her [c]omplaint, [Martha] propounded copious discovery demands and has had the benefits of responses from [defendant]s. She has participated in discovery by producing thousands of documents which [defendant]s promptly reviewed in order to comply with the Chancery [c]ourts trial scheduling. Even [Martha]'s refusal to appear for a noticed deposition weighs in favor of waiver as [Martha]'s deposition was noticed months prior to her [m]otion to [c]ompel [a]rbitration and, as it drew near, [Martha] moved to change the forum thereby "depriv[ing defendants] of the ability to carry out [such] deposition[] as a right under the Rules of Court." . . . .

Fifth, [Martha] has not raised arbitration in any of her prior filings – to the contrary, she has certified that arbitration was not contemplated. [Martha] initiated this action by filing a [c]omplaint and [OTSC] for immediate restraints rather than asserting her purported right to arbitration. [Martha] further affirmatively certified to this [c]ourt that the matter in controversy was not the subject of an arbitration nor was any other "arbitration proceeding . . . presently contemplated." . . . <u>Rule</u> 4:5-1 recognizes a "continuing obligation" to amend the certification if the underlying facts change. [Martha] made no such amendments. Instead, [Martha] filed an [a]nswer to [c]ounterclaim on January 2, 2024[,] asserting thirteen affirmative defenses, none of which raised arbitration. . . . such pleadings and the <u>Rule</u> 4:5-1 certification of counsel "strongly weigh as a factor in favor of waiver."

Sixth, the proximity of trial date also weighs heavily against [Martha]. This case was scheduled for trial beginning August 6, 2024, just two months from the return date of [Martha]'s [m]otion to [c]ompel [a]rbitration. The Chancery [c]ourt was emphatic when setting the trial date that it wished to move this matter expeditiously to trial within a year of its filing. . . . Once the [p]arties were nearing that trial date, with discovery well underway, and with the possibility of summary judgment, [Martha] sought to force the case to hit the restart button to begin anew in a different forum. [Martha]'s request to compel arbitration and combine this case with the arbitration of the Law Division [c]ase should have fallen on deaf ears as, in denying [Martha]'s [m]otion to [c]onsolidate, the Chancery [c]ourt already determined that the two cases are separate and distinct. [Defendant]s were diligently moving forward towards the August 6, 2024 trial date and were hampered by [Martha]'s refusal to comply

21

with discovery demands and tactical maneuver to compel arbitration.

Seventh, [defendant]s have and will continue to face prejudice should this matter be compelled to arbitration because [defendant]s already engaged in over nine months of litigation, been subjected to temporary restraints for eighteen months, engaged in mediation and motion practice, made seven [c]ourt appearances, and responded to/reviewed copious discovery. [Defendant]s seek to move this matter expeditiously either to trial or to summary judgment. To force this case to arbitration would unduly delay the resolution of this case for an indefinite amount of time. This prejudice weighs in favor of [defendant]s.

In response, Martha contends "given the chain of events that occurred [since the inception of the litigation] . . . to [her m]otion to [c]ompel, factors one, two, and three weigh in favor of arbitration." She notes, during the time

[her v]erified [c]omplaint and proposed [OTSC] with [t]emporary [r]estraints were filed on August 22, 2023. . . . In September 2023, [d]efendants filed a [m]otion to dissolve or modify the restraints, as well as an [OTSC] to disqualify [her] counsel. . . . In October 2023, new counsel substituted in for [her]. . . . Defendants then filed their [a]nswer with [c]ounterclaims on October 19, 2023. Thereafter the parties agreed to mediate, which occurred in December 2023, but was unsuccessful. In January 2024, [she] filed her [a]nswer to [d]efendants' [c]ounterclaims.

On January 19, 2024, [she] filed a [m]otion to [c]onsolidate the Chancery [a]ction with [d]efendants' Law Division [a]ction, which was ultimately denied on March 8, 2024. . . . On April 10, 2024, [Martha] filed

a [m]otion to [c]ompel [a]rbitration in the Law Division [a]ction, however, that application was eventually withdrawn, as the parties had agreed to mediate, which was memorialized in a [c]onsent [o]rder dated May 28, 2024. . . . The motion court noted that injunctions are standard pre-arbitration. On May 17, 2024, [she] filed the [m]otion to [c]ompel [a]rbitration that is the subject of this appeal. Dispositive motions had not been filed. . . .

As to factor four, Martha asserts that "discovery did not commence until March 8, 2024, when [her m]otion to [c]onsolidate was denied." She contends "[t]he motion court correctly noted that while some discovery had been done, there was still a substantial amount of work to be completed, which included depositions." Therefore, Martha contends "[f]actor four weighs in favor of arbitration."

Martha argues factor five also weighs in favor of arbitration. She asserts she did not "presently" contemplate arbitration when the certification was filed with her verified complaint. Thus, the certification "was accurate at the time of that filing." In addition, she contends her failure to "assert arbitration as an affirmative defense does not prove her intent to waive her legal right to it."

Regarding factor six, Martha acknowledges "trial was scheduled to begin in August 2024, two months after the date on which oral argument was heard on [her m]otion to [c]ompel" arbitration and "[d]efendants' counsel claimed they

23

would be ready to proceed to trial."  Nevertheless, she asserts "the trial court was rightfully skeptical of [counsel's] statement given the amount of discovery that still needed to be completed, as well as, dispositive motions, and therefore, factor six weighs in favor of arbitration."

Martha also asserts that defendants would not be prejudiced under factor seven.  She contends, "given the relationship between the parties and the interrelated nature of the claims that all arise out of the same deal made between [her] and . . . Bernardo, [d]efendants' claim of prejudice is tenuous and speculative."  Instead, Martha argues compelling arbitration and requiring the Chancery matter to be arbitrated with the Law Division matter benefits the parties because:  (1) the matters "overlap"; (2) they can avoid "duplicating discovery"; (3) they can save "time" and "cost[s]."  Therefore, Martha contends, "factor seven weighs in favor of arbitration."

We are clearly convinced Martha waived her right to arbitration.  We are persuaded by defendants' detailed analysis of the Cole factors.  In addition, we note Martha chose to file her verified complaint in the Chancery Division and, despite plentiful filings and appearances, never once—from August 2023 the time of filing her complaint, until her motion to compel arbitration was filed in May 2024—apprised the court or defendants of her desire to invoke the parties'

24                                                                                    A-3693-23

arbitration agreement. Therefore, factor one—delay—weighs in favor of waiver.

Second, we note dispositive motions had not been filed by the time Martha filed her motion to compel arbitration. Nonetheless, the parties engaged in motion practice in the Chancery court. Defendants moved to disqualify Martha's counsel. More importantly, Martha sought to consolidate the Law Division matter with her Chancery matter. Not only is the filing of a motion evidence of waiver, but the relief sought, to maintain the matter in the Chancery Division, is clearly evidence of waiver. Therefore, factor two—motion practice—weighs in favor of waiver.

Under the third factor, Martha's actions could be construed as a litigation strategy. Indeed, Martha maintained the matter in the Chancery court for nearly a year, was about to be deposed, was on the eve of trial, and only filed to compel arbitration after her motion to consolidate failed. This factor weighs in favor of waiver.

Under the fourth factor, we note the parties had conducted discovery. Martha argues there was a "substantial amount" more to do. However, while additional discovery may have been required, we cannot ignore defendants' unrebutted assertion that "discovery was ongoing and extensive. Both [p]arties

served substantial paper discovery . . . and produced a combined over 4,400 pages of documents." Further, for whatever reason, Martha stopped cooperating with discovery. The fourth factor weighs in favor of waiver.

We have previously addressed the fifth factor. Martha gave no indication, in her various filings and appearances, that she intended to seek arbitration. Indeed, her motion to consolidate the Law Division matter with the Chancery matter evidences an intent to maintain her claims in court. This factor weighs in favor of waiver.

Martha acknowledges the trial date was mere months away from when she filed to compel the matter to arbitration. The sixth factor weighs in favor of waiver.

Lastly, defendants would be prejudiced by compelling arbitration at this time. As stated, discovery was robust and ongoing, Martha's deposition was scheduled, and trial was scheduled to commence in a mere matter of months. In addition, defendants have been restrained since Martha's filing of her verified complaint. To require defendants to begin this matter anew and in an arbitration forum is prejudicial. Factor seven weighs in favor of waiver.

After a careful review of the Cole factors, we conclude the Chancery Division erred in granting plaintiff's motion to compel arbitration.

26

Reversed and remanded for trial.  We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M. C. Harley

Clerk of the Appellate Division